2019 PA Super 237

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAYNE WILLIAM REED | : | |
| | : | |
| Appellant | : | No. 1160 WDA 2018 |

Appeal from the Judgment of Sentence Entered July 12, 2018
In the Court of Common Pleas of McKean County Criminal Division at
No(s): CP-42-CR-0000200-2017

BEFORE: BENDER, P.J.E., NICHOLS, J., and COLINS, J.[*]

OPINION BY NICHOLS, J.: **FILED AUGUST 05, 2019**

Appellant Shayne William Reed appeals from the judgment of sentence entered after a jury found him guilty of burglary, criminal trespass, conspiracy of theft by unlawful taking, and conspiracy of receiving stolen property.[1] Appellant challenges the sufficiency of evidence. We affirm.

The relevant facts and procedural history of this case are as follows. Theresa Skillman, the property owner of 65 Summer Street, rented the upstairs apartment at this address to Appellant and Appellant's girlfriend, Amber Harris. N.T., 5/23/18, at 31, 53. The property consisted of a house divided into two apartments (an upstairs apartment and a downstairs

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3502(a)(4), 3503(a)(1)(ii), 903(a)(1), 3921(a), and 3925(a), respectively. Appellant was also charged with conspiracy of criminal mischief, which was graded as a summary offense. The trial court separately found Appellant guilty of the summary offense.

apartment), a basement, and two outdoor sheds situated on off-street parking next to the house. *Id.* at 32.

Mike Holden, the former tenant of Appellant's upstairs apartment, stored his property in the smaller of the two sheds. *Id.* at 42. Skillman's father and brother kept property in the other larger brown shed. *Id.* at 41. The larger shed was roughly twelve feet by sixteen feet and had "a big garage door on it, [a] little man door, [and a] couple [of] windows." *Id.* at 74. The shed was secured so that "all the windows were locked, the man door was screwed shut to where you couldn't open it from the outside, and the garage door had a lock and key." *Id.* at 75. When a new tenant would move in, Skillman would inform the tenant not to touch the larger shed and to use the basement for storage. *Id.* at 32. Katelyn King, the tenant in the downstairs apartment, testified that tenants were not supposed to use or go into either shed. *Id.* at 58.

On or about February 8, 2017, Katelyn King testified that she saw Appellant and his female roommate "messing around" inside the larger shed at 2:00 a.m.[2] *Id.* at 59-61. Marcia Copeland, who lived across the street at 70 Summer Street, also witnessed Appellant and a female individual in the

_____

[2] While Katelyn King did not explicitly state that the date was February 8, 2017, she responded "yes" when asked whether she was living at 65 Summer Street on February 8, 2017, and whether she witnessed anything that prompted her to contact Appellee on February 8, 2017. N.T. at 59.

shed.[3] *Id.* at 66. Copeland approached the individuals and told them, "[Y]ou are not to be in that area." *Id.* Appellant and the female responded, "We have permission to be in here [from Holden]." *Id.* Copeland told them, "No, you do not have permission from him. . . . Not to mention, that's not [his shed]." *Id.* Appellant and the female individual left, but a couple hours later, Copeland saw them in the shed again. *Id.* at 68.

Both Katelyn King and Holden notified Skillman that there were people inside of the shed where her father's property was stored.[4] *Id.* at 35, 38. Based on this information, Skillman called the Bradford City Police and spoke with Officer Kolin Strawcutter.[5] *Id.* at 39. Skillman told Officer Strawcutter that she believed her rental property had been burglarized. *Id.* at 40. Skillman also informed Officer Strawcutter that while she currently resided in Marienville, her brother, Edward Panighetti, Jr., lived closer to the rental property and that she could contact him about the shed. *Id.*

After Skillman's initial conversation with Officer Strawcutter, Skillman sent a text message to Panighetti. Upon receiving the text message,

_____

[3] The record does not state the particular date Copeland saw Appellant and a female individual in the shed other than it was "sometime in February of 2017." N.T. at 65.

[4] The record does not state how Holden knew that there were people inside of Appellant's shed.

[5] The Affidavit of Probable Cause states that Officer Strawcutter received Appellant's call on February 11, 2017, at 8:40 a.m.

Panighetti went to check the property by himself. *Id.* at 40, 76. Panighetti had last visited the shed less than a week before. *Id.* at 76. Following Panighetti's visit, Skillman also went by herself to check on the shed. Officer Strawcutter called Skillman and Panighetti after their respective visits to the shed.[6] Both Skillman and Panighetti told Officer Strawcutter that the handle and the lock on the shed were broken and there was a new, unfamiliar padlock on the right-hand side of the shed. *Id.* They also reported that a truck tire and window previously inside the shed were now sitting outside the shed. *Id.* at 76, 97.

Officer Strawcutter, Skillman, and Panighetti all visited the shed together to examine the damage at some later date. *Id.* at 40, 76. Accompanied by Officer Strawcutter, Panighetti, and Skillman entered the shed for the first time after the padlock was changed. *Id.* at 76. Skillman testified that upon entering the shed, it was clear that "there was obviously a lot less stuff in it than had started." *Id.* at 41. Panighetti testified that "[a] lot of the power tools, a tree stand, and some clothing previously stored inside were missing." *Id.* at 77. Panighetti listed twenty-six items that he had stored inside the shed himself, but were missing when he saw the shed with

---

[6] The record does not specify the date that Skillman checked the shed. Skillman testified that Panighetti went first to inspect the property. N.T. at 40. Officer Strawcutter testified that Skillman called to say that she had gone to the property and relayed her observations of the shed. *Id.* at 97. After Officer Strawcutter's conversation with Skillman, Officer Strawcutter contacted Panighetti and listened to his observations of the shed. *Id.*

Officer Strawcutter and Skillman. *Id.* at 87-88. These items included various power tools for construction and gardening. *Id.*

Skillman located some of the items missing from the shed on a Facebook garage sale page in which Robert King, a junk dealer, was offering these items for sale. *Id.* at 98. Skillman informed Officer Strawcutter of Robert King and the Facebook page. Officer Strawcutter subsequently contacted Robert King, who told Officer Strawcutter that "he was actually on his way to the police station because he heard that the items he had bought from a Amber Harris were stolen and not her property." *Id.*

During the course of his investigation, Officer Strawcutter also spoke with Richard Keaton, who had purchased speakers from Harris through Facebook. *Id.* at 91, 92. When Keaton went to Summer Street to pick up the speakers, he saw Harris "in the shed trying to move stuff around to get [the speakers] out." *Id.* at 92. After the purchase, Keaton heard from a friend that the speakers were stolen. *Id.* Keaton contacted Officer Strawcutter, who came to retrieve the speakers. *Id.*

On February 14, 2017, Officer Strawcutter filed charges and arrested Appellant. *Id.* at 99-100. The Commonwealth filed an information charging him with one count of burglary, one count of criminal trespass, and three counts of criminal conspiracy. The Commonwealth's information alleged that these crimes occurred between February 9 and February 11 of 2017.

On May 23, 2018, a jury convicted Appellant. On July 12, 2018, the trial court sentenced Appellant to ten days' to twelve months' incarceration,

followed by twelve months' probation. Appellant timely filed a post-sentence motion on July 23, 2018, which he withdrew on August 6, 2018.

Appellant timely filed a notice of appeal on August 13, 2018. Appellant also timely filed a court-ordered Pa.R.A.P. 1925(b) statement on September 5, 2018, challenging the sufficiency of evidence on all counts. The trial court filed a responsive Rule 1925(a) opinion and concluded that Appellant was not entitled to relief.

Appellant now raises the following questions for this Court's review:

1. Whether the evidence was sufficient to establish that the "shed" located at 65 Summer Street is a "building" or "occupied structure" under 18 Pa.C.S. §3502(a)(4), Burglary, and under 18 Pa.C.S. §3503(a)(1)(ii), Criminal Trespass?

2. Whether the evidence was sufficient to sustain a finding of guilt under 18 Pa.C.S. §3503(a)(1)(ii), Criminal Trespass, where the Commonwealth's evidence was insufficient to prove beyond a reasonable doubt that the Appellant broke into the shed located at 65 Summer Street?

3. Whether the evidence was sufficient to prove beyond a reasonable doubt that the Appellant entered into a conspiratorial agreement with Amber Harris to support a finding of guilt at Count 1 and Count 2 of the Amended Criminal Information?

Appellant's Brief at 7-8.

Appellant's first claim challenges the sufficiency of the evidence for burglary and criminal trespass. Appellant argues that the Commonwealth failed to establish that the shed at 65 Summer Street was a "building" within the meaning of the burglary and criminal trespass statutes. *Id.* at 7, 23. Specifically, Appellant contends that the Commonwealth did not establish that

- 6 -

the shed was completely enclosed, that is, that the shed had a roof and four walls. *Id.* at 23.

The Commonwealth concedes that the shed is not an "occupied structure," as it is neither adapted for overnight accommodations nor serves to carry on business. *See* Commonwealth's Brief at 5; *see also* 18 Pa.C.S. § 3501 (defining an "occupied structure" as "[a]ny structure, vehicle or place adapted for overnight accommodation of persons, or for carrying on business therein, whether or not a person is actually present"). However, the Commonwealth asserts there was ample evidence to establish that the shed was a "building" within the meaning of the relevant statutes.

The standard of review for a challenge to the sufficiency of evidence is well settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 186 A.3d 985, 990-91 (Pa. Super. 2018) (citation omitted).

Section 3502(a)(4) states that a person commits burglary "if, with the intent to commit a crime therein, the person enters a building or occupied structure, or separately secured or occupied portion thereof that is not adapted for overnight accommodations in which at the time of the offense no person is present." 18 Pa.C.S. § 3502(a)(4). Section 3503(a)(1)(ii) states that a person commits criminal trespass "if, knowing that he is not licensed or privileged to do so, he breaks into any building or occupied structure or separately secured or occupied portion thereof." 18 Pa.C.S. § 3503(a)(1)(ii).

Neither Section 3502(a)(4) nor Section 3503(a)(1)(ii) defines "building." Therefore, because whether a shed is a "building" under Sections 3502(a)(4) and 3503(a)(1)(ii) "concerns a matter of statutory interpretation and is, thus, a pure question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Chester*, 101 A.3d 56, 60 (Pa. 2014) (citation omitted).

> When interpreting a statute, this Court must apply the Statutory Construction Act of 1972. The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature and give effect to all of the provisions of the statute. When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. Generally, a statute's plain language provides the best indication of legislative intent. In reading a statute's plain language, words and phrases shall be construed according to rules of grammar and according to their common and approved usage, while any words or phrases that have acquired a

peculiar and appropriate meaning must be construed according to that meaning.

**Commonwealth v. Andrews**, 173 A.3d 1219, 1221 (Pa. Super. 2017) (citations and quotation marks omitted).

Therefore, we turn to the "common and approved usage" of the term "building." **See Chester**, 101 A.3d at 63. Black's Law Dictionary defines a building as: "[a] structure with walls and a roof." Black's Law Dictionary 222 (9th ed. 2009); **accord** Concise Oxford English Dictionary 183 (10th ed. 2002) (defining building as "a structure with a roof and walls"). Similarly, another dictionary defines "building" as

> a constructed edifice designed to stand more or less permanently, covering a space of land, usu[ally] covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure—distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (as boats or trailers) even though subject to occupancy[.]

Webster's Third Int'l Dictionary 292 (1968). Therefore, a commonly accepted definition of "building" is a structure with walls and a roof.

Here, viewing the facts in the light most favorable to the Commonwealth, the record establishes that the shed had a locked garage door, screwed-shut man door, and locked windows. **See** N.T. at 74, 75. The shed also contained power tools, which the jury could reasonably infer would be stored in an enclosed place, safe from inclement weather. **Id.** at 87-88. Furthermore, after the break-in, both Skillman and Panighetti found that the

shed's handle was broken. *Id.* at 40. A fact-finder could reasonably infer that the shed had four walls and a roof, as otherwise, a locked door would seemingly serve no purpose. It was for the fact-finder to conclude, which it did, that the shed was completely enclosed such that Appellant had to force the door open to enter the shed. Therefore, we find no merit to Appellant's argument that the Commonwealth failed to establish that the shed was a "building" for the purposes of 18 Pa.C.S. § 3502(a)(4), and 18 Pa.C.S. § 3503(a)(1)(ii).

We acknowledge that Appellant has also argued that the shed was not adapted for overnight accommodations. But Appellant overlooked that he was convicted of second-degree burglary under 18 Pa.C.S. § 3502(a)(4), and not first-degree burglary under 18 Pa.C.S. § 3502(a)(1), (a)(2), or (a)(3). As set forth above, second-degree burglary applies to "a building or occupied structure, or separately secured or occupied portion thereof that is **not adapted** for overnight accommodations . . . ." 18 Pa.C.S. § 3502(a)(4) (emphasis added). Similarly, the offense of criminal trespass, 18 Pa.C.S. § 3503(a)(1)(ii), merely requires the Commonwealth to establish the defendant "breaks into any building." **See** 18 Pa.C.S. § 3503(a)(1)(ii). Therefore, neither statute required the Commonwealth to establish that the shed was adapted for overnight accommodations, and this argument lacks merit.

Appellant's second claim asserts that the trial evidence is insufficient to establish beyond a reasonable doubt that Appellant "broke into" the shed, as defined by the criminal trespass statute, 18 Pa.C.S. § 3503(a)(1)(ii).

- 10 -

Appellant's Brief at 24. Appellant argues that since "the record is silent on who actually damaged the lock . . . it could just as easily be inferred that the lock was damaged prior to Appellant entering the garage, and Appellant could have simply entered through an unlocked door." *Id.* at 24.

Section 3503 of the Criminal Code defines "breaks into" as "to gain entry by force, breaking, intimidation, unauthorized opening of locks, or through an opening not designed for human access." 18 Pa.C.S. § 3503(a)(3). For purposes of Section 3503(a)(1)(ii), a felony of the second degree, gaining entry merely by entering through an unlocked door does not constitute "breaking in." 18 Pa.C.S. § 3503(a)(2); *Commonwealth v. Cook*, 547 A.2d 406, 411 (Pa. Super. 1988) (holding that "a criminal trespass involving the entry of a building . . . by opening an unlocked door was punishable as a felony of the third degree").

Instantly, Katelyn King and Copeland both witnessed Appellant and his girlfriend **inside** the shed at 2:00 a.m. N.T. at 66, 60-62. Further, the record reflects that all of the windows and doors of the shed had been secured prior to the break-in and that Panighetti had inspected the shed only a week before the break-in. *Id.* at 75-76. When confronted by a neighbor, Appellant and his girlfriend attempted to explain that a former tenant had given them privilege to enter the shed. When the neighbor questioned their response, they left, only to return a short time later. Moreover, when Skillman, Panighetti, and Officer Strawcutter inspected the shed after the reported break-in, they found a broken door handle and a new, unfamiliar padlock on

- 11 -

the shed. *Id.* at 40-41, 76. Viewing these circumstances in a light most favorable to the Commonwealth, we find sufficient circumstantial evidence existed such that a jury could reasonably infer that Appellant broke into the shed by breaking the original lock by force. *See Brown*, 186 A.3d at 990-91.

In support of his third claim, Appellant argues that the evidence was insufficient to establish that he entered into a "conspiratorial agreement" with his girlfriend, Harris, to commit theft by unlawful taking and receiving stolen property. Appellant's Brief at 34. Appellant reasons that the "testimony fail[ed] to identify [Appellant's female] companion as Amber Harris" and neither "[Appellant] nor [Harris] were ever observed to be in possession of [the] specific items" missing from the shed. *Id.* at 25. Appellant concludes that "the evidence [was] insufficient to establish beyond a reasonable doubt that [he and Harris] entered into an agreement that one or more of them would steal those items." *Id.* at 37.

Similarly, Appellant argues there was insufficient evidence to prove beyond a reasonable doubt that he and Harris had "a conspiratorial relationship to commit the crime of Receiving Stolen Property," because the Commonwealth failed to prove that "the items that went missing were received by either [Appellant] or [Harris]." *Id.* In sum, in Appellant's view, the evidence was too speculative for a jury to reasonably infer that he and Harris entered into a conspiracy to steal and dispose of the items in question. *Id.* at 39.

A person is guilty of conspiracy "if with the intent of promoting or facilitating its commission he . . . agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." 18 Pa.C.S. § 903(a)(1).

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of the shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved, and it need not be, for proof of criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt.

*Commonwealth v. Melvin*, 103 A.3d 1, 42-43 (Pa. Super. 2014) (citation omitted). Furthermore, "[o]nce the trier of fact finds that there was an agreement and the [defendant] intentionally entered into the agreement, that [the defendant] may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Commonwealth v. Barnes*, 871 A.2d 812, 820 (Pa. Super. 2005) (citation omitted).

A person is guilty of theft by unlawful taking "if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). A person is guilty of receiving

stolen property "if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." 18 Pa.C.S. § 3925(a). "Receiving" is statutorily defined as "acquiring possession, control or title, or lending on the security of the property." 18 Pa.C.S. § 3925(b).

Instantly, Appellant asks us to find that the evidence was insufficient to identify Appellant's female companion as Harris. However, Katelyn King stated she saw Appellant and his female roommate, *i.e.* Harris, inside the shed. Therefore, Appellant's argument goes to the weight, rather than sufficiency, of the evidence. *See Commonwealth v. Sanders*, 42 A.3d 325, 329 (Pa. Super. 2012) (holding that "the credibility of witnesses [who identified the defendant as the culprit] is not to be re-weighed on appeal").

With respect to Appellant's challenge as to the existence of a conspiratorial agreement, the record reveals that Appellant and Harris were living together and in an intimate relationship. *See* N.T. at 53. Appellant and Harris were seen in the shed together multiple times by two different witnesses. Katelyn King, who lived in the apartment directly under the apartment of Appellant and Harris, testified that when she saw Appellant enter and leave the shed, Appellant was accompanied by his female roommate. *See id.* at 61. Furthermore, when Copeland approached Appellant and Harris and told them to leave the shed, Appellant and Harris stood beside each other and argued with Copeland together. *See id.* at 68, 71. When Appellant and Harris

left the shed, they left together and when they returned to the shed, they returned together. *Id.* at 68. When viewing the evidence in the light most favorable to the verdict-winner, a jury could reasonably infer from Appellant and Harris' "relation, [conduct, circumstances, and overt acts]" that the two had a "shared criminal intent" to unlawfully take and receive stolen property from the shed. *See Melvin*, 103 A.3d at 42-43.

Moreover, Robert King and Keaton also testified that the stolen property they acquired was from Harris. *See* N.T. at 91, 92, 98. In particular, based on Keaton's eyewitness account of Harris physically taking the speakers from inside the shed, a jury could find that Harris was intentionally disposing of stolen property. *See id.* at 92. In sum, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, Appellant's sufficiency challenge fails. *See Brown*, 186 A.3d at 990-91. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/5/2019

- 15 -