J-S56018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1069 EDA 2019 |

Appeal from the Order Entered March 11, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002190-2018,
FID: 51-FN-001852-2018

BEFORE: PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 12, 2020**

R.G. ("Mother") appeals from the order entered by the Court of Common Pleas of Philadelphia County on March 11, 2019, finding that her minor daughter, R.G. ("Child") (a female born in March 2007), was a victim of child abuse under the Child Protective Services Law ("CPSL"), 23 Pa.C.S. § 6303.[1] After careful review, we affirm.

The trial court discussed the factual and procedural history of the case as follows:

On August 24, 2018, the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report alleging that

---

[1] On that same day, the court entered an identical order as to M.L.L., Mother's paramour. M.L.L. separately filed a notice of appeal, docketed at 1047 EDA 2019. Accordingly, we address his issues in a separate memorandum.

Child disclosed that [M.L.L.][2] had sexually molested Child. Specifically, Child disclosed to [DHS] that on more than one occasion between the years of 2017-2018[ M.L.L.] had entered Child's bedroom while she was sleeping and sexually assaulted Child. On August 24, 201[8], DHS advised Mother of these allegations and advised Mother that [M.L.L.] be kept away from Child.

On August 30, 2018, the Philadelphia Police Department's Special Victims Unit ("SVU") conducted a forensic interview during which Child disclosed that she was sexually assaulted by [M.L.L.]. DHS filed the underlying Petition for Dependency on October 2, 2018, which was granted[.] Child was adjudicated dependent on December 13, 2018[,] following a hearing. Thereafter, on March 11, 2019, the [c]ourt held a hearing to determine if Mother and [M.L.L.] were perpetrators of Child abuse. Mother and [M.L.L.] were present at the hearing and represented by counsel.

Trial Court Opinion, 7/9/19, at 1-2 (citations omitted).

At the hearing, counsel for DHS presented the testimony of Sharina Johnson, DHS social worker; Jillian Shainman, the Philadelphia Children's Alliance forensic interviewer; Sydelle Chase, Community Umbrella Agency ("CUA") case manager; and Child, who testified *in camera*.[3]

Ms. Johnson testified that she has worked at DHS for almost 12 years, and has been in the Sex Abuse Investigation department for almost five years. **See** N.T., 3/11/19, at 9-10. She conducts about 100 investigations a year and has conducted a little over 500 investigations in total. **Id.** at 10. The

---

[2] The trial court opinion refers to M.L.L. as "stepfather" despite the fact that he and Mother are not married.

[3] The transcript of Child's testimony was unsealed after motion by M.L.L.'s counsel and by order of the trial court. **See** Order, 9/6/19, at 1.

instant matter became known to DHS following allegations of sexual abuse by Child. *Id.* DHS received a CPS report on August 24, 2018.[4] *Id.* at 10-11.

Ms. Johnson testified that the report was generated after Child disclosed to a cousin that M.L.L. had removed Child's underwear, penetrated Child's vagina and anus with his penis, and had oral contact with Child's vaginal area. *Id.* at 12. The cousin in turn informed Mother, who brought Child to Children's Hospital of Philadelphia ("CHOP"). *Id.* Hotline caseworkers went to interview Child before the report was assigned to Ms. Johnson. *Id.* She went to the family's home, but found they were not home. *Id.* at 12-14. Ms. Johnson did not make contact with the family until August 28, 2018, when she met with Mother and her three children. *Id.* at 14-15.

Ms. Johnson testified that she informed Mother of the allegations and what Child had disclosed to Ms. Johnson during the interview. *Id.* at 13-15. In response, Mother said, "She's not going to say it happened and she's not going to say it didn't happen." *Id.* at 15. Ms. Johnson also informed Mother that there was to be no contact between M.L.L. and the children. *Id* at 15-16. Ms. Johnson testified that she spoke to Child and her siblings,[5] and that Child

_____

[4] M.L.L.'s counsel objected to the introduction of the facts the report alleged as hearsay, and because no tender years motion had been filed or litigated. *Id.* at 11. After counsel for DHS argued that she was asking as to the narrative of the report, not the actual statements, the court overruled the objection. *Id.* at 11-12. Mother's counsel did not object to the testimony. *Id.* At the conclusion of testimony, counsel for DHS moved to enter the report into evidence and Mother's counsel did join the objection. *Id.* at 49.

[5] Father's counsel made a standing objection, which was overruled. *Id.* at 16-17. Mother's counsel did not join the standing objection. *Id.*

identified M.L.L. as the perpetrator and that he had put his penis in her anus and his mouth on her vagina, and that this abuse had occurred between eight and ten times over the course of several years. *Id.* at 17. Child also stated that Mother knew what was occurring. *Id.* Child described the addresses where the abuse occurred, and where the family had been living in a boarding room, and stated that one of her sisters was asleep next to her at the time. *Id.* at 17-18. Neither sister disclosed any additional information to Ms. Johnson. *Id.* at 18-19.

Ms. Johnson asked Mother for M.L.L.'s contact information and, while she initially demurred, she eventually provided his phone number. *Id.* at 19. A few minutes after Ms. Johnson left the home, M.L.L. called her via cell phone. *Id.* Ms. Johnson informed him of "his right[] to speak to [her] without an attorney present" and of the reported allegations. *Id.* M.L.L. denied everything, informed Ms. Johnson that Child was coached by a 12-year-old cousin because she did not want to come home that day, and accused Child of lying. *Id.* at 19-20. M.L.L. claimed that Child lied about other incidents at school. *Id.* at 20.

Ms. Johnson testified that Child attended an initial interview at the Philadelphia Children's Alliance ("PCA") on August 30, 2018. *Id.* at 21-22. Present at the interview were Ms. Johnson, a police officer, and Mother. *Id.* at 22. Child was interviewed and made a full disclosure, in similar detail to

what she told Ms. Johnson.[6]  *Id.* at 22.  Child also stated that M.L.L. put baby oil on her when he was finished.  *Id.*

Following these interviews, services were implemented for the family, and PCA recommended therapy for Child.  *Id.* at 21.  Ms. Johnson attempted to have a conversation with Mother, but it did not go well and Mother did not provide a supporting statement for Child.  *Id.* at 23.  Mother was not compliant, refused phone calls, and stopped engaging with PCA.  *Id.* at 21. Ms. Johnson again attempted to reach out to Mother to bring Child in for services, but Mother provided excuses.  *Id.* at 24.

Ms. Johnson received additional information that M.L.L. was once more residing in the home.  *Id.* at 24-25.  At the younger children's daycare, Ms. Johnson learned M.L.L. was bringing the children to and from daycare in violation of the safety plan Mother had signed.  *Id.* at 26-28.  Ms. Johnson contacted Child at school and, while Child initially denied that M.L.L. was living there, she eventually admitted that she was told by Mother not to inform DHS. *Id.* at 24-25.  Child's siblings also confirmed M.L.L. was living in the home. *Id.* at 48.  Mother also attempted to deny M.L.L. was living in the home, but later confirmed that he was.  *Id.*  Mother indicated to Ms. Johnson that she needed M.L.L.'s help with the children and his financial support.  *Id.* at 28. Accordingly, DHS obtained an order for protective custody ("OPC") of Child and her two siblings on September 25, 2018.  *Id.* at 25-28.

_____

[6] M.L.L.'s attorney lodged an objection. *Id.* at 22.  Mother's counsel did not object. *Id.*

After the children were removed from the home, M.L.L. called Ms. Johnson ten times and yelled at her, calling Child a liar. *Id.* at 27. M.L.L. stated that if he did anything to Child, DHS would know based on his penis size. *Id.* at 27. Ms. Johnson testified that the report was indicated as to M.L.L. because Child provided a clear, consistent disclosure of abuse, and there was no reason to believe she would make anything up. *Id.* at 27. The report was indicated as to Mother because she had knowledge of the abuse and continued to allow M.L.L. access to the children, despite the fact that she signed a safety plan. *Id.* at 27-28.

Jillian Shainman, a forensic interviewer at PCA, testified over M.L.L.'s objection; Mother's counsel did not join the objection. *Id.* at 53-54. Ms. Shainman described her job as "speaking with children about allegations of abuse in a developmentally appropriate and forensically sound manner." *Id.* at 54. Ms. Shainman described her work experience and the process of interviewing a child before testifying regarding her interview with Child, conducted on August 30, 2018. *Id.* at 55-56.

During the interview, Child was alone in the room with Ms. Shainman; observing in a separate room were Police Officer Claire Duckworth and Ms. Johnson. *Id.* at 56. Ms. Shainman did not speak to Mother prior to the interview but did review Child's allegations. *Id.* at 57. Child offered information consistent with the allegations in the reports, namely, that M.L.L. put his penis in her butt more than once, put his mouth on her vagina more than once, put his penis on her feet, and touched and licked Child's breasts.

*Id.* at 57-58. Child was "calm and friendly" throughout the interview, with a neutral affect that is not unusual for children being interviewed. *Id.* at 58. Nothing about Child's demeanor caused Ms. Shainman to question her truthfulness. *Id.* at 59.

Following the interview, Ms. Shainman discussed the interview with Mother. *Id.* at 58. Mother repeatedly said that she believed Child, but repeatedly discussed concerns that Child's cousin might have coached her, as well as concerns that M.L.L. would be arrested. *Id.* at 59.

Sydelle Chase, CUA case manager, testified that Child is currently placed in non-kinship foster care through New Foundations. *Id.* at 64. Mother's single case plan ("SCP") objectives were to comply with court orders, complete a parenting capacity evaluation ("PCE"), comply with the stay-away order pertaining to the children, attend a Behavioral Health Systems ("BHS") evaluation and follow through with recommendations, and to attend and participate in the Sage program. *Id.* at 65. As of the date of the hearing, Mother did not complete a BHS or PCE evaluation, and did not start at Sage. *Id.* Child was on the waiting list for therapy. *Id.* at 66.

Child testified *in camera* at the hearing. *See* N.T., 3/11/19, *In Camera*, at 1-26. At that time, she was 11 years old and in sixth grade. *Id.* at 4. Child stated that the reason she was in court was to "see if [she were] going home or not," and stated that the most important thing was to tell the truth. *Id.* at 5.

Child testified that she knew M.L.L. since she was very young and calls him "DJ". *Id.* at 5. She could not remember how many homes she had lived in, but it was "a lot." *Id.* Child did remember the name of the street she lived on when the abuse first occurred. *Id.* at 6-7. At that home, she shared a room with her younger sister. *Id.* at 7. At that time, M.L.L. came into her room, pulled her pants and underwear down, and put his penis in her anus. *Id.* at 7-8. At other times, M.L.L. put his tongue on and his fingers in her vagina. *Id.* at 8. The abuse always occurred on her bed, sometimes while her younger sister was sleeping next to her. *Id.* at 8. After M.L.L. was finished, he would put baby oil on her anus and vagina. *Id.* at 9, 14-16. Child testified that the abuse occurred more than once but she could not remember how many times, although she had previously given testimony at a preliminary hearing. *Id.* at 11-12. Child testified that the abuse occurred in multiple homes and locations. *Id.* at 13-17.

Child testified that she first told her 12-year-old cousin about the abuse when sleeping over at her aunt's house. *Id.* at 9-10. After the disclosure, Child's cousin told her mother, Child's aunt. *Id.* at 10. Child's aunt asked her if she wanted to call the police immediately, or wait until the next day to go to the hospital. *Id.* at 11. Child chose to wait to go to the hospital. *Id.* Child told her mother, as well, but Mother stated that she did not believe her and that she had been coached. *Id.* at 12. After her disclosure, Child saw M.L.L. again at her mother's house. *Id.* at 12-13.

Child testified that she did not tell Mother about the bad touching before because she was afraid of Mother not believing her. *Id.* at 19-20. After Child finally told Mother, Mother took her to the hospital the next day. *Id.* at 21. However, Child stated that Mother told her that if anyone asked if M.L.L. were still living with the family, to lie and say "no." *Id.* at 21.

M.L.L. did not testify, but instead offered, by way of stipulation, a portion of Child's medical records indicating that Child's hymen was intact and that she was lacking signs of trauma. *See* N.T., 3/11/19, at 7, 73-74. M.L.L. acknowledged that the absence of evidence of acute injury is not dispositive to the issue of whether or not abuse occurred. *Id.*

Following the hearing, the court entered a permanency review order finding that Child was a victim of child abuse pursuant to 23 Pa.C.S. § 6303(b.1)(4) as to M.L.L., and 23 Pa.C.S. § 6303(b.1)(6) as to Mother.

Mother timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court committed an error of law and an abuse of discretion by finding [Child was] a victim of child abuse by [Mother] as defined by 23 Pa.C.S.A. § 6303[?]

2. Whether the trial court committed an error of law and an abuse of discretion by finding [Child was] a victim of child abuse by [Mother], when DHS failed to prove by clear and convincing evidence that [Mother] act[ed] intentionally, knowingly, or recklessly or that [Mother] caused any [harm] or created a risk of harm to the child as required by 23 Pa.C.S.A. § 6303(b)(1)[?]

3. Whether the trial court committed an error of law and an abuse of discretion by finding [Child was] a victim of child abuse by [Mother], where DHS failed to prove by clear and convincing evidence that the child was abused as defined by 23 Pa.C.S.A. § 6303(b)(1)[?]

Mother's Brief at 5 (some capitalization omitted).

> The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).  The admission of evidence is within the purview of the trial court's discretion.  *See In re C.M.T.*, 861 A.2d 348, 355 (Pa. Super. 2004).

> While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, the [CPSL] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence.  *See In the Interest of J.R.W.*, 631 A.2d 1019 (Pa. Super. 1993).  As the Supreme Court explained in *In the Interest of L.Z.*, [111 A.3d 1164, 1176 (Pa. 2015)], "[as] part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

*In The Interest of T.G.*, 208 A.3d 487, 490 (Pa. Super. 2019).

> With regard to findings of child abuse,

> [t]he [CPSL] defines "child abuse" as "intentionally, knowingly or recklessly ... [c]ausing sexual abuse or exploitation of a child through any act or failure to act."  23 Pa.C.S. § 6303(b.1)(4). "Sexual abuse or exploitation" is defined as "[t]he employment,

- 10 -

use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes ... [a]ctual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification of any individual." 23 Pa.C.S. § 6303(a). A finding of abuse must be supported by clear and convincing evidence*. **In Interest of J.R.W.**, [631 A.2d 1019, 1024 (Pa. Super. 1993)].

**Interest of I.R.-R.**, 208 A.3d 514, 520 (Pa. Super. 2019). Further, "[i]n cases of child abuse, a court's finding as to the identity of the abusers need only be established by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers." **In re R.P.**, 957 A.2d 1205, 1217–1218 (Pa. Super. 2008) (some citations omitted).

We address Mother's issues as one because, despite the fact that she identifies three separate issues in her statement of questions presented, she provides only a single argument. Essentially, Mother contends that DHS did not present sufficient evidence to establish that she committed child abuse as to Child. Mother argues that the only evidence supporting the notion that M.L.L. was living in the home were the out-of-court hearsay statements of Child, who she claims, without evidence, was "coerced" by the DHS caseworker. *Id.* at 10-11. Additionally, Mother contends that her actions did not create the likelihood of sexual abuse or exploitation pursuant to 23 Pa.C.S. § 6303(b)(1)(6), because she had moved into a new residence without M.L.L., and there was no allegation of further incidents of abuse. *Id.*

Initially, we address Mother's claim that the only evidence was Child's out-of-court hearsay statements. "Hearsay" is "a statement that (1) the

declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). "Hearsay is not admissible except as provided by [the Pennsylvania Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Prior to examining the merits of her issue, we must first determine whether Mother preserved her challenges. Pursuant to Pa.R.A.P. 302(a), issues not raised in the lower court are waived and cannot be raised for the first time on appeal. *See* Pa.R.A.P. 302. At no time during the hearing did Mother object to Ms. Johnson's or Ms. Shainman's testimony regarding the out-of-court statements of Child. Mother did object to the testimony regarding the contents of the CPS report. Her Pa.R.A.P. 1925(b) statement of errors complained of on appeal does not mention the out-of-court hearsay statements of Child or the CPS report, but solely challenges the sufficiency of the evidence. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal). Additionally, Mother cites to no case law regarding Child's out-of-court statements or the hearsay rule in general. *See*, *e.g.*, *Thomas v. Thomas*, 194 A.3d 220, 229 (Pa. Super. 2018) (noting that appellant must support each issue raised by discussion and analysis of pertinent authority; failure to do so hampers this Court's review and risks waiver). Accordingly, we conclude that

Mother waived her challenges to Child's out-of-court statements, the testimony regarding the CPS report, and the testimony of Child.

Accordingly, we turn to the sole issue contained in Mother's brief, which attacks the finding of child abuse pursuant to 23 Pa.C.S. § 6303(b)(1)(6), arguing that DHS did not prove its case by clear and convincing evidence, and that none of her actions created the likelihood of sexual abuse pursuant to the statute. **See** Mother's Brief at 10-11.[7]

As noted above, the CPSL defines "child abuse" as "intentionally, knowingly or recklessly . . . [c]ausing sexual abuse or exploitation of a child through any act or failure to act." 23 Pa.C.S. § 6303(b.1)(4). Sexual abuse or exploitation is defined as "[t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes . . . [a]ctual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification of any individual." 23 Pa.C.S. § 6303(a). The specific provision that applied to Mother is intentionally, knowingly, or recklessly "creating a likelihood of

_____

[7] The standard we apply in reviewing the sufficiency of the evidence is whether viewing all of the evidence admitted at the hearing in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the claim. **Commonwealth v. Reed**, 216 A.3d, 1114, 1119 (Pa. Super. 2019) (citation omitted). In applying this test, "the entire record must be evaluated and all evidence actually received must be considered." **Id.** We acknowledge the incongruity between our holdings in M.L.L.'s appeal and in Mother's appeal. However, in reviewing Mother's sufficiency claim, we are obligated to view all of the evidence admitted, even the improperly admitted hearsay evidence.

sexual abuse or exploitation of a child through any recent act or failure to act."

23 Pa.C.S. § 6303(b.1)(6).

Here, the trial court observed that

> I find the child to be extremely credible in describing what happened to her. She may not recall whether it was four years or two years, but it was quite clear to the [c]ourt that this happened, and that the perpetrator was [M.L.L.]. So therefore with regard to [M.L.L.], I am making a finding of child abuse under (b)(1)(4). With regard to [M]other, I'm making a finding of child abuse, since she let this man, with knowledge from her own daughter, knowing that the daughter had made a complaint of sexual abuse by [M.L.L.]—let him back into the child's life, and did not protect the child after the incident occurred, and after the police were told, and after a safety plan was developed. So I'm making a finding of child abuse under [23 Pa.C.S. § 6303](b)(1)(6).

N.T., 3/11/19, 82-83.

The testimony of Ms. Johnson established that Child was taken into care after disclosing to a cousin that M.L.L. had, on several occasions, removed Child's underwear, penetrated her vagina and anus with his penis, and had oral contact with Child's vaginal area; this information was included in a CPS report. *See* N.T., 3/11/19, at 12. Ms. Johnson interviewed Mother, Child, and Child's siblings, and Child identified M.L.L. as the perpetrator. *Id.* at 15-17. Child informed Ms. Johnson that this abuse occurred between eight and ten times over the course of several years and at several addresses where the family lived. *Id.* Ms. Johnson accompanied Child to PCA interviews, where Child made a full disclosure in similar detail, and added that M.L.L. put baby oil on her when he finished. *Id.* at 21-22.

During Ms. Johnson's interactions with Mother, Mother repeatedly called into doubt Child's disclosures and made excuses for M.L.L. *Id.* at 15-25. Although Mother signed a safety plan stating that M.L.L. was not to have contact with any of the children, and was not to reside in the home, he returned. *Id.* Mother did not appear to appreciate the danger of M.L.L.'s presence in the home, and continued to provide excuses, such as her need for assistance with the younger children, and for financial support. *Id.* Additionally, the evidence supports that Mother knew she should not have allowed M.L.L. back into the home, because she instructed Child to lie to case workers about his presence. *Id.* at 24-25. Regardless of Mother's intimations that Child was coached, Ms. Johnson testified that Child provided a clear, consistent, disclosure of abuse and she had no reason to believe Child was lying. *Id.* at 27-28. Accordingly, she indicated the report was proper as to Mother due to Mother allowing M.L.L. access to the children after a police report was made. *Id.*

Ms. Shainman testified regarding the interviews she conducted with Child at PCA on August 30, 2018. *Id.* at 53-56. During the interview, Child's account was consistent with the allegations she made in the reports, namely, that M.L.L. put his penis in her "butt" more than once, put his mouth on her vagina more than once, put his penis on her feet, and touched and licked Child's breasts. *Id.* at 57-58. Child was calm and friendly throughout the interview, and nothing about her demeanor caused Ms. Shainman to question her truthfulness. *Id.* at 59. After the interview, Mother repeatedly stated

that she believed Child but expressed concerns that Child was coached and that M.L.L. would be arrested. *Id.*

Child testified at the hearing. *See* N.T., 3/11/19, *In Camera*, at 1-26. Child understood that the most important thing was to tell the truth. *Id.* at 5. While Child could not always remember the addresses and years the abuse had occurred, she testified consistently regarding what M.L.L. had done to her and approximately when these acts of abuse had happened. *Id.* at 6-8. Child testified that M.L.L. would come into her room, pull her panties down, and put his penis in her butt. *Id.* At other times, M.L.L. would put his tongue and fingers in Child's vagina. *Id.* The abuse always occurred while Child was in bed, sometimes with her younger sister asleep next to her. *Id.* When M.L.L. finished, he would put baby oil on Child's anus and vagina. *Id.*

Child testified that she waited to disclose the abuse because she was afraid her mother would not believe her. *Id.* at 10-12, 19-20. Child testified that M.L.L. returned to the home and that Mother told her to lie that he was not living in the home. *Id.* at 19-21. Finally, Child's medical records, stating that there were no physical findings of abuse or acute injury, with the understanding that this was not dispositive as to the issue, were admitted by stipulation. *See* N.T., 3/11/19, at 7, 73-74.

In light of this testimony, it was not error for the trial court to conclude that Mother knowingly caused a likelihood of sexual abuse or exploitation of Child, based upon 1) Mother's knowledge that Child made credible accusations of sexual abuse against M.L.L.; 2) Mother signed a safety plan barring M.L.L.

from further contact with the children; 3) Mother allowed M.L.L. to have continued contact with Child, including overnight; and 4) Mother knew she was in violation of the plan, because she instructed Child to lie about M.L.L.'s continued presence. ***See***, ***e.g.***, ***I.R.-R.***, 308 A.3d at 520. Ms. Johnson and Ms. Shainman testified that Child was consistent in the contents of her disclosures, and they did not have any reason to doubt her disclosure. Child herself testified substantially in accordance with her disclosures, and the trial court, as was its purview, found her testimony credible and convincing. ***M.G.***, 855 A.2d at 73-74.

Accordingly, the court did not err in finding, by clear and convincing evidence, that Mother had committed child abuse as to Child. ***See Interest of J.R.W.***, 631 A.2d at 1024.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/20