J-S17029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARSHAWN TYLIQUE WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1321 WDA 2022 |

Appeal from the Judgment of Sentence Entered September 15, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0001115-2021

BEFORE:  LAZARUS, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED: OCTOBER 3, 2023**

Appellant, Marshawn Tylique Williams, appeals from the September 15, 2022 judgment of sentence entered in the Court of Common Pleas of Erie County that imposed an aggregate sentence of life imprisonment without the possibility of parole to be followed by 18½ to 37 years' incarceration after a jury convicted Appellant of second-degree murder, robbery – inflicts serious bodily injury upon another, and conspiracy to commit robbery.[1]  We affirm.

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), and 903 (3701(a)(1)(i)), respectively.  The trial court imposed a sentence of life imprisonment without the possibility of parole for Appellant's second-degree murder conviction.  The trial court also imposed a sentence of 10 to 20 years' incarceration for Appellant's robbery conviction and 8½ to 17 years' incarceration for his conspiracy to commit robbery conviction.  The conspiracy sentence was set to run consecutively to the robbery sentence, and the robbery sentence was set to run consecutively to the second-degree murder conviction.

The trial court summarized the factual and procedural history as follows:

In autumn of 2019, Appellant, [] and others, hatched a scheme to steal money and marijuana from a known dealer[, the victim.] Their objective was to make entry into [the victim's house], raid his [supply] of marijuana and cash, and flee with the loot. On December 7, 2019, [Appellant], along with other co-conspirators, attempted to execute the plan. Lying in wait in [the victim's] backyard, they ambushed [the victim's] friend, Daniel Dugan [("Dugan"), who was] on his way to watch a football game at [the victim's] house, forcing Dugan to knock on the backdoor at gunpoint. When [the victim] answered the door, a struggle ensued, one of the conspirators fired a gun, and minutes later, [the victim] lay dead with bullet wounds to the head and neck. On June 9, 2022, a jury found [Appellant] guilty of murder in the second degree, robbery, conspiracy to commit robbery, and [criminal attempt to commit burglary of an overnight accommodation with a person present]. On September 15, 2022, the [trial] court sentenced [Appellant] to an aggregate term of imprisonment of life [without the possibility of parole] plus 18½ to 37 years[' incarceration. That same day, the trial court vacated Appellant's conviction of criminal attempt to commit burglary.] On September 26, 2022, [Appellant] filed a motion to reconsider and modify sentence, which the [trial] court denied on October 11, 2022.

---

Appellant was also convicted of, and sentenced for, criminal attempt to commit burglary of an overnight accommodation with a person present. 18 Pa.C.S.A. § 901(a). On September 15, 2022, the trial court vacated Appellant's conviction of, and sentence imposed for, criminal attempt to commit burglary "as [this offense was] inconsistent with 18 Pa.C.S.[A.] § 906, in light of the conviction and sentence for conspiracy to commit robbery[.]" Trial Court Order, 9/15/22; *see also* 18 Pa.C.S.A. § 906 (stating, "[a] person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or criminal conspiracy for conduct designed to commit or to culminate in the commission of the same crime").

Trial Court Opinion, 2/9/23, at 1 (footnote and extraneous capitalization omitted).  This appeal followed.[2]

Appellant raises the following issue for our review:

Did the Commonwealth present insufficient evidence to sustain Appellant's convictions for all charges when the evidence did not establish [a] sufficient connection between [] Appellant and the firearm in question or that [A]ppellant was present at the time of the shooting?

Appellant's Brief at 2 (extraneous capitalization omitted).

Appellant's issue raises a challenge to the sufficiency of the evidence to support his convictions for which our standard and scope of review are well-settled.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered.  Finally, the [fact-finder] while passing upon the

_____

[2] Both Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

- 3 -

credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Reed*, 216 A.3d 1114, 1119 (Pa. Super. 2019).

"A criminal homicide constitutes murder of the second degree, commonly known as felony murder in Pennsylvania, when the homicide is committed while [a] defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b); *see also Commonwealth v. Mitchell*, 135 A.3d 1097, 1101 (Pa. Super. 2016), *appeal denied*, 135 A.3d 1097 (Pa. 2016). The Crimes Code defines the term "perpetration of a felony" as "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping."[3] 18 Pa.C.S.A. § 2502(d).

---

[3] As we shall detail more fully below, Appellant's direct involvement in the killing and robbery of the victim does not implicate a theory of accomplice liability. Nevertheless, we offer the following explanation of an "accomplice" to facilitate a complete understanding of the offense of second-degree murder.

A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

"A person is guilty of robbery if, in the course of committing a theft, he[, or she,] inflicts serious bodily injury upon another[.]" 18 Pa.C.S.A. § 3701(a)(1)(i). "An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S.A. § 3701(2). "A defendant [] may be guilty of robbery as an accomplice or co-conspirator as long as the defendant possessed the requisite *mens rea* to commit the criminal act and the additional elements of accomplice liability or conspiratorial liability are established." **Mitchell**, 135 A.3d at 1102. "A person is a conspirator if the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." **Id.** (citation and original quotation marks omitted).

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere

---

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306(c). "When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense." 18 Pa.C.S.A. § 306(d). "Accomplice liability may be established wholly by circumstantial evidence. Only the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is required, only aid." **Mitchell**, 135 A.3d at 1102 (citation and original quotation marks omitted).

association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.*, that the [defendant] was an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1016 (Pa. Super. 2002) (citation and quotation marks omitted), *appeal denied*, 795 A.2d 1010 (Pa. 2002). "A conspiracy is almost always proved through circumstantial evidence." ***Lambert***, 795 A.2d at 1016. As association between alleged conspirators, a defendant's knowledge of the commission of the crime, the defendant's presence at the scene of the crime, and, in some situations, the defendant's participation in the object of the conspiracy "may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred." ***Id.*** (citation omitted).

In finding sufficient evidence existed to support Appellant's convictions, the trial court explained,

Viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, the evidence is sufficient to support the jury's guilty verdicts as to all convictions. In particular, there is sufficient evidence from which the jury could conclude beyond a reasonable doubt that [Appellant] was both in the backyard during the incident and that he pointed a gun at [the victim] when [the victim] answered the door, thereby attempting to obtain the personal property of the victim using force, threat, or intimidation, as necessary to sustain the robbery conviction. Most notably, the testimony of [Dugan] puts an individual matching [Appellant's] description in the backyard. Other evidence, such as the testimony of [Michael] Toles [("Toles")] and [Melissa] Seaman [("Seaman")], and the still

- 6 -

photographs, videos, and [tele]phone [call-]logs, provide ample support for the conclusion that the "light skinned" African American individual identified by Dugan is, in fact, [Appellant].

Trial Court Opinion, 2/9/23, at 3-4.[4]

The record demonstrates that, at trial, Toles testified that prior to the murder, he was romantically involved with Seaman and was friends with Appellant. N.T., 6/6/22, at 155. Toles stated that, approximately six weeks prior to the murder, he was driving a vehicle in which Appellant and Derrick Elverton [("Elverton")[5]] were passengers. *Id.* at 155-157, 159. During the ride, a conversation ensued that involved a discussion of the victim and committing a "lick," which Toles explained was a drug transaction involving a robbery, as a means of making money. *Id.* at 155. Toles testified that

_____

[4] The trial court further found that "Dugan's testimony further demonstrates that [Appellant] brandished a gun, and critically, that he pointed the gun at [the victim] **before [the victim was] shot by another co-conspirator**." Trial Court Opinion, 2/9/23, at 4 (emphasis added). Our careful review of Dugan's trial testimony as a whole, coupled with other evidence, viewed in the light most favorable to the Commonwealth as verdict winner, as detailed *infra*, reveals that Dugan implicated Appellant, based upon both his clothing and complexion, as the individual who brandished a firearm, pointed a firearm at the victim, and fired the fatal shot. *See* N.T., 6/2/22, at 85-134; *see also* N.T., 6/6/22, at 146.

As discussed *infra*, even setting the trial court's finding aside, there is sufficient evidence of Appellant's awareness and participation with others in the criminal plot to acquire the victim's property through force or threat of force to support Appellant's multiple convictions.

[5] Elverton was one of the co-defendants in the criminal trial involving Appellant. The other two co-defendants were Damarjon Beason ("Beason") and Anthony Blanks ("Blanks").

Appellant was part of the conversation and was present in the vehicle during the conversation about committing a "lick" that involved the victim *Id.* at 161, 164.

Toles testified that several weeks later, he was again driving a vehicle in which Appellant was a passenger, along with Seaman and Luis Tirado ("Tirado") who went by the street-name "Moo-Moo". *Id.* at 165-167. Toles stated that Appellant raised the subject of the victim and committing a "lick." *Id.* at 168. Thereafter, Toles drove the vehicle to the victim's house where Appellant, Tirado, and Toles exited the vehicle and approached the victim's house with the intent to commit a robbery. *Id.* at 169-173. Toles stated that he knew Appellant had a gun with him. *Id.* at 170. Ultimately, the three individuals decided not to carry out the "lick" after Tirado's cellular telephone rang as the individuals approached the victim's house and "threw everybody off." *Id.* at 173. Toles testified that Appellant was "calling the shots" that evening, and Appellant made the decision to abort the robbery. *Id.* at 174.

Toles further testified that, on the day of the murder, he received a telephone call from Appellant in which Appellant requested a ride. *Id.* at 177. When Toles arrived to pick Appellant up, Appellant was waiting with Elverton and another individual, later identified as Beason. *Id.* at 179-181. Toles drove Appellant, Elverton, and Beason to the victim's neighborhood. *Id.* at 183. After dropping Appellant and the other two individuals near the victim's house, Toles waited in his parked vehicle. *Id.* at 190. Appellant, Elverton, and Beason returned to the parked vehicle for a brief period of time, at which

point Beason obtained a handgun from a person, later identified as Blanks, who was walking on the street nearby. *Id.* at 193-197. After obtaining a handgun, Appellant, Elverton, and Beason exited the vehicle and walked towards the victim's house. *Id.* at 197-200. Shortly thereafter, Toles stated that he "thought [he] heard gunshots." *Id.* at 201. Toles left the area in his vehicle, and returned to his house where he discovered Seaman and Appellant. *Id.* at 203-204. It was at this time that Appellant told Toles that "things went bad" and the victim "got shot." *Id.* at 204.

Seaman testified that several weeks prior to the murder, Appellant stated that the victim "would be a good lick," meaning someone who was easily robbed. N.T., 6/3/22, at 170-171. Seaman stated that she rode in a vehicle to the victim's house, and remained in the vehicle while Appellant, Toles, and Janiya Blanks got out of the vehicle to "check out [the victim's] house." *Id.* at 171,174. Seaman testified that she returned to the victim's neighborhood shortly thereafter, this time in a vehicle with Toles, Appellant, and Tirado *Id.* at 176. The purpose of this excursion was so Appellant, Toles, and Tirado could rob the victim. *Id.* at 176. Seaman remained in the vehicle, but she was unable to see where the three individuals went after exiting the vehicle. *Id.* at 177-178.

Seaman further testified that on the evening of the murder, Appellant returned to her house and told her that "they went to go lick [the victim] and then it went bad." *Id.* at 181. Seaman stated that Appellant asked her to

"get rid of some pants" for him. *Id.* at 181-182 (explaining that the pants in question were the pants Appellant was then wearing).

Dugan testified that he and the victim were friends, and that on the day of the murder, he went to the victim's house so they could watch a championship football game together. N.T., 6/2/22, at 86-87. After parking his vehicle near the victim's house, Dugan exited his vehicle and proceeded towards the victim's backyard *via* a driveway. *Id.* at 95-97. As he approached the victim's backyard, Dugan saw a person standing on the back porch of the victim's house wearing a light blue jacket. *Id.* at 95-96, 99. As Dugan was about to enter the victim's backyard, another individual approached him from behind, and Dugan felt something "like a butt of a gun" being pressed against the side of his torso. *Id.* at 96-98. The person that approached Dugan walked with Dugan to the victim's backdoor. This individual wore a black jacket. *Id.* at 99. As he walked towards the victim's backdoor, Dugan saw a third individual, who was also wearing a black jacket. *Id.* at 99. The individual holding a handgun to Dugan's back instructed Dugan to knock on the victim's backdoor. *Id.* at 100-101. As the victim opened the door, Dugan stood on the other side of the door and two individuals stood on either side of Dugan.[6] *Id.* at 102-103. After the victim opened the door, Dugan stated the individual

_____

[6] The individual that Dugan first observed standing on the victim's back porch did not move from his position and was not either of the two individuals who were standing behind Dugan as he knocked on the victim's backdoor. N.T., 6/2/22, at 100.

with the handgun to his back raised the handgun and fired a shot towards the victim. *Id.* at 103-104. Dugan described the shooter as "a light-skinned African American" or "a Hispanic person[.]" *Id.* at 111. Dugan stated that the victim, upon seeing the shooter raise a handgun towards him, reached for the handgun, and after a shot was fired, the victim's body fell towards Dugan. *Id.* at 105. The three individuals then fled the victim's backyard leaving Dugan with the victim's body. *Id.* Dugan was unable to identify any of the assailants in a police line-up. *Id.* at 112. On cross-examination, Dugan agreed, however, that he saw only one of the three individuals with a handgun. *Id.* at 120

Michael Hertel, a detective sergeant with the City of Erie Police Department, ("Detective Hertel") testified that, based upon information supplied by Dugan, police suspected that three individuals were involved in the murder and that two of the individuals wore "black or dark coats" and one of the individuals wore a "light blue coat." N.T., 6/3/22, at 242. While investigating the crime scene, the police recovered, *inter alia*, a handgun, from inside in a cardboard box near the crime scene, a light blue jacket and blue sweatpants, both of which were discovered under a wheelchair ramp affixed to a nearby house, and a cellular telephone, which was discovered in close proximity to the jacket and sweatpants. *Id.* at 243-244. The police were also able to obtain video surveillance footage from several cameras positioned throughout the surrounding neighborhood. *Id.* at 246-247. In one video recording, three individuals were observed walking westbound towards the

victim's house shortly before the murder. *Id.* at 248-249. One of the individuals (Beason) was observed wearing a black jacket with a red emblem on the left breast area of the jacket, gray sweatpants, and black "Jordan 4 Retro" sneakers with white soles. *Id.* at 252, 255. A second individual (Elverton) was observed wearing a light blue jacket, a dark-colored sweatshirt with a hood, blue sweatpants, and gray and white sneakers. *Id.* at 252-253. The third individual (Appellant) was observed wearing a black jacket, a black knit hat, blue jeans "with a little bit of stonewash," and black sneakers. *Id.* at 253. The third individual's jacket had a "distinguishing mark" on the right breast area of the jacket, which Detective Hertel described as a "white mark" that was either a defect in the jacket or part of the jacket. *Id.* at 254.

In short, the video surveillance footage showed three individuals exiting a parked vehicle near the crime scene and, shortly before the murder, walking in the victim's neighborhood, returning to the parked vehicle for a short period of time, exiting the parked vehicle a second time, walking back towards the victim's neighborhood, and approaching the victim's backyard *via* the backyard of a house adjacent to the victim's house. *Id.* 248-276; *see also* N.T., 6/6/22, at 64-72. After the three individuals were observed returning to the parked vehicle but before they were observed exiting the vehicle a second time, another individual (Blanks) was observed approaching the parked vehicle, standing next to the driver's side of the vehicle for a short period, and then walking away from the vehicle. N.T., 6/3/22, at 262-276; *see also* N.T., 6/6/22, at 64. Shortly after the murder, one of the three

- 12 -

individuals (Elverton) was observed near the crime scene wearing a hooded sweatshirt, pants, and shoes and holding a handgun. N.T., 6/3/22, at 276. This individual was not wearing a jacket. *Id.* at 277.

After the three individuals approached the victim's backyard, Dugan was observed arriving at the victim's house. N.T., 6/6/22, at 72-73. Shortly thereafter, the three individuals were observed running away from the victim's house. Two individuals (one individual was wearing a dark jacket, light colored pants, and black sneakers (Beason); the other individual was wearing a hooded sweatshirt (Elverton)) ran in one direction and Appellant ran in a different direction. *Id.* at 74-77, 82, 86. Moments later, Dugan was observed leaving the victim's house. *Id.* at 78. One of the two individuals who fled the crime scene together (Beason) is observed shortly thereafter talking on his cellular telephone. *Id.* at 89-90.

As part of his investigation, Detective Hertel was able to obtain information, including photographs, from a co-defendant's social media accounts. Detective Hertel testified that he obtained a photograph, captured on November 29, 2019, of Elverton wearing a light blue jacket.[7] *Id.* at 125-127. Elverton's online account for his cellular telephone showed that Elverton's cellular telephone was put into "lost mode" on December 9, 2019. *Id.* Shortly before the cellular telephone was placed in "lost mode," the global

---

[7] The parties stipulated that Elverton was the major source of DNA discovered on both the light blue jacket and light blue sweatpants that were discovered from the crime scene. N.T., 6/7/22, at 187, 209.

- 13 -

positioning of the cellular telephone showed that the cellular telephone was located "kitty-corner across the street" from the Erie Police Department. *Id.* at 130. The parties stipulated at trial that the cellular telephone discovered near the crime scene contained a telephone number and electronic mail account associated with Elverton.[8] N.T., 6/7/22, at 106.

Photographs and videos obtained from Beason's social media account showed Beason wearing a black jacket with a red emblem on the chest area of the jacket. N.T., 6/6/22, at 138-139, 143. Another photograph showed Beason with a pair of Jordan 4 Retro black and white sneakers. *Id.* at 143. Finally, a video obtained from Beason's social media account showed Beason "describing [Appellant] as light-skinned Mar[.]" *Id.* at 146. Photographs obtained of Appellant showed him wearing a dark colored jacket with a white mark on the jacket. N.T., 6/7/22, at 133.

Detective Hertel agreed that a video of Appellant's police interview showed Appellant explaining "through some detail about how [Appellant] couldn't imagine how it was for [an individual who was at the victim's house on the night of the murder and who witnessed the victim's death] seeing what [the individual] saw[.]" N.T., 6/7/22, at 111. Detective Hertel stated that he did not provide Appellant any details of the last moments of the victim's life before Appellant provided details surrounding the victim's death. *Id.*

---

[8] The parties further stipulated that Elverton's DNA was the only source of DNA obtained from the cellular telephone. N.T., 6/7/22, at 187, 209.

Appellant also admitted that he knew the victim sold marijuana and that he purchased marijuana from the victim in the past. *Id.* at 110, 180.

Craig Stoker, a detective sergeant with the City of Erie Police Department, ("Detective Stoker") testified that Toles identified Appellant, Elverton, and Beason as the three individuals who rode in his vehicle and exited his vehicle near the crime scene on the night of the murder. N.T., 6/7/22, at 214-218. Detective Stoker stated that an analysis of Appellant's cellular telephone call-log revealed that on the day of the murder, there were out-going calls from Appellant's cellular telephone to Elverton's cellular telephone and in-coming calls from Elverton's cellular telephone received by Appellant's cellular telephone in the hours preceding the murder. *Id.* at 231. During that same time period, out-going and in-coming calls were occurring between the cellular telephones operated by Beason and Elverton. *Id.* at 237-239. Appellant made no calls on his cellular telephone between 4:28 p.m. and 5:49 p.m. on the day of the murder. *Id.* at 235. The murder took place at approximately 5:45 p.m. *Id.* at 229. At 5:49:55 p.m., Appellant placed an out-going call to Elverton's cellular telephone. *Id.* at 234. At 5:56 p.m. Appellant received a call from Beason's cellular telephone, and at 5:57 p.m., Appellant returned a call to Beason's cellular telephone. *Id.* at 235. At 5:57:49 p.m., Beason placed a call to Appellant's cellular telephone, and he placed a second call to Appellant's cellular telephone at 5:59:59 p.m. *Id.*

Our review confirms that the Commonwealth, which - as the verdict winner - is entitled to every favorable inference supported by the record,

proved beyond a reasonable doubt that Appellant both agreed to and participated in the robbery and murder of the victim. Witness testimony established that Appellant was present for, and involved in, several conversations regarding the victim's known-involvement in the sale of illegal narcotics. Trial testimony also established that Appellant considered the victim a good "lick" or an easy target for robbery because he kept both illegal narcotics and money in his house. Witness testimony and video surveillance footage placed Appellant and two of his co-defendants, Elverton and Beason, in the vicinity of the victim's house both immediately before and after the murder. Appellant was identified as wearing a black jacket with a white mark on the chest area. Beason was described as wearing a black jacket with a red emblem on the chest area. Elverton was described as wearing a blight blue jacket. Dugan described the shooter as a "light-skinned African American or Hispanic" man who was wearing a black jacket. A video obtained from a social media account showed Beason describing Appellant as being "light-skinned." Seaman stated that on the evening of the murder, Appellant came to her house confessing that he participated in a "lick" involving the victim, that the "lick" had gone bad, and that he needed her to get rid of the pants he wore during the episode. Finally, during a police interview, Appellant expressed details regarding the murder that could only have been known by someone who was present during its commission. In viewing the record in the light most favorable to the Commonwealth, we conclude there was sufficient evidence to permit the jury, as fact-finder, to conclude that Appellant was

guilty of the offenses with which he was charged. Therefore, Appellant's sufficiency claim is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/3/2023