J-S20008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| HORATIO E. BOYD | : | |
| | : | |
| Appellant | : | No. 1510 MDA 2024 |

Appeal from the Judgment of Sentence Entered September 25, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001457-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| HORATIO E. BOYD | : | |
| | : | |
| Appellant | : | No. 1511 MDA 2024 |

Appeal from the Judgment of Sentence Entered September 25, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001467-2021

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.: **FILED: AUGUST 25, 2025**

In this consolidated appeal, Appellant, Horatio E. Boyd, appeals from

the September 25, 2024 judgments of sentence entered in the Court of

Common Pleas of Dauphin County.[1]  Appellant was convicted of drug delivery resulting in death and several other drug related offenses, as explained in greater detail *infra*, and sentenced to an aggregate term of 10 to 20 years' incarceration.  After careful review, we affirm.

The trial court summarized the factual history as follows:

On January 21, 2021, Officer John Doll was dispatched to [a residence on North 2nd Street] in Harrisburg, Pennsylvania to assist [the fire department] and [emergency medical services which had been summoned following] discovery of a deceased male.  The [male] had been deceased for approximately eight to ten hours.  Donald Machamer, [the deputy coroner with the] Dauphin County [Coroner's Office], took samples [from the deceased] and sent them [for] toxicology [testing].  The toxicology report showed a presence of fentanyl and norfentanyl in the deceased's blood and urine [samples].  Forensic Investigator Karen Lyda with the Harrisburg Bureau of Police photographed the scene.  She specifically photographed evidence on the deceased's nightstand, including a red glass pipe, a red straw, powder residue, and two [cellular telephones].  Forensic Scientist Amber Gagg with the Pennsylvania State Police Bureau of Forensic Science Services tested the powder residue located on the deceased's nightstand.  The results came back [positive for] tetrahydrocannabinol, also known as THC, fentanyl, and etizolam.

Dr. Wayne Ross ("Dr. Ross"), a forensic pathologist with the Dauphin County Coroner's Office, conducted a postmortem [examination and prepared a] report regarding the deceased['s cause of death].  Dr. Ross reviewed the toxicology report, the photographs and evidence from the scene, and the deceased's

---

[1] In an October 25, 2024 *per curiam* order, this Court *sua sponte* consolidated Appellant's appeals docketed by this Court at 1510 MDA 2024 and 1511 MDA 2024.

Appellant's judgments of sentence were entered at trial court docket numbers CP-22-CR-1457-2021 ("Case 1457") and CP-22-CR-1467-2021 ("Case 1467").

medical history to determine the cause and manner of death. Dr. Ross testified that the deceased had 9.2 nanograms [per milliliter] of fentanyl in his blood, which is three times the level[] that will kill a human. In reviewing the photographs from the scene, Dr. Ross observed that the deceased had a cyanotic face which indicates a lack of oxygen in the blood. Dr. Ross testified that cyanosis [accompanies] fentanyl [use] and acute fentanyl toxicity[, as] well as etizolam toxicity. Based on the evidence from the scene, the toxicology report, and the deceased's medical history, it [was] Dr. Ross' professional opinion that the deceased's cause of death [was] acute fentanyl and etizolam toxicity.

Sergeant Brian Henry [("Sergeant Henry")] of the Harrisburg Bureau of Police responded to the scene [due to] reports of a suspicious death. Sergeant Henry toured the scene for evidence of drug use. He observed a straw that is consistent with snorting fentanyl and a red glass pipe that is typically consistent with smoking marijuana. Both were sent for testing and came back with a presumptive positive [test result] for fentanyl. Because of that finding, Sergeant Henry began his narcotics investigation. Sergeant Henry searched the deceased's [cellular telephones,] as well as surveillance footage from the area. Surveillance footage obtained from the Pennsylvania Corrections Officers Association building show[ed] that[,] on January 20, 2021, an individual[,] later identified as [Appellant, arrived at, and departed from,] the deceased's home. Shortly after [Appellant left] the [deceased's] home, another individual[,] driving a black Kia [sedan, arrived] at the home and then [departed]. On January 21, 2021, [an individual driving a black Kia sedan arrived] at the [deceased's] home [and the driver of the vehicle, upon exiting the vehicle, was] holding [what appeared to be] a grocery bag [and had] a conversation with someone outside of the home. [The driver then entered] the home [and was observed leaving the home] shortly after. A [telephone] call was placed to 9-1-1 [emergency services] approximately one hour later. [Textual] messages [(commonly referred to as "text messages")[2]] retrieved from one of the deceased's [cellular telephones] shows that the deceased

---

[2] The term "text message" is defined as "writings or other data transmitted electronically by cellular telephones that constitute an electronic communication for purposes of the Wiretap Act." *Commonwealth v. Koch*, 39 A.3d 996, 1003 (Pa. Super. 2011) (citation and original quotation marks omitted), *aff'd by an equally divided court*, 106 A.3d 705 (Pa. 2014).

[communicated] with a narcotics dealer named ["Dee" during the period of] January 14-20, 2021. [During this time period, the] deceased made multiple [drug-related] purchases [from "Dee."] On January 20, 2021, the deceased made another [drug-related] purchase [from "Dee."] Following the [deceased's] death, the police used [the cellular telephone] to call ["Dee" and arrange a drug purchase. "Dee"] then showed up to the deceased's home while police were waiting and was identified as [Appellant. Appellant] ran when police approached him. He was eventually taken into custody and searched incident to arrest. He was in possession of $120[.00 in United States] currency in denominations of $20[.00] bills, a [cellular telephone], and four glassine bags of suspected heroin [or] fentanyl. [Appellant] did not have any paraphernalia on his person that would suggest personal use [of drugs]. A [cellular telephone] was later discovered along the flight path [Appellant] took [when evading the police officers]. This [cellular telephone] contained matching text messages with the deceased. [Appellant] had [contact information for] the deceased saved [to his cellular telephone contacts list] as ["5:45."]

Trial Court Opinion, 1/10/25, at 2-4 (extraneous capitalization and record citations omitted).

On August 23, 2024, a jury convicted Appellant, in Case 1457, of drug delivery resulting in death (Count 1), the manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance (Count 2), and criminal use of a communication facility (Count 3).[3] In Case 1467, the jury convicted Appellant of the manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance (Count 1), criminal use of a

---

[3] 18 Pa.C.S.A. § 2506(a), 35 P.S. 780-113(a)(30), and 18 Pa.C.S.A. § 7512(a), respectively.

communication facility (Count 2), and use of, or possession with intent to use, drug paraphernalia (Count 3).[4]

On September 25, 2024, the trial court sentenced Appellant, in Case 1457, as follows: Count 1 – 8 to 16 years' incarceration; Count 2 – 1 to 2 years' incarceration; and Count 3 – 1 to 2 years' incarceration. The sentences imposed in Case 1457 were set to run concurrently to each other resulting in an aggregate sentence of 8 to 16 years' incarceration. In Case 1467, the trial court sentenced Appellant as follows: Count 1 – 2 to 4 years' incarceration; Count 2 – 1 to 2 years' incarceration; and Count 3 – no further punishment. The sentences imposed in Case 1467 were set to run concurrently to each other resulting in an aggregate sentence of 2 to 4 years' incarceration. The aggregate sentence imposed in Case 1467 was set to run consecutively to the aggregate sentence imposed in Case 1457, which resulted in a total term of incarceration of 10 to 20 years. This appeal followed.[5]

Appellant raises the following issues for our review:

---

[4] 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. § 7512(a), and 35 P.S. § 780-113(a)(32), respectively.

Appellant's two criminal cases were joined for purpose of trial.

[5] Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

[1.]    Whether the [trial] court erred in [admitting into evidence] text messages [that lacked authentication of authorship and that] were irrelevant to [the charges filed in this case]?

[2.]    Whether the Commonwealth failed to present sufficient evidence that the narcotics which caused the death of the [deceased] were the same narcotics sold by [Appellant] when there were multiple potential sources of narcotics and the Commonwealth did not demonstrate that [Appellant] was the exclusive provider of narcotics beyond a reasonable doubt[?]

Appellant's Brief at 6 (extraneous capitalization omitted).

In his first issue, Appellant challenges the trial court's denial of his motion *in limine* that sought to exclude from evidence certain text messages sent to individuals other than the deceased that were recovered from Appellant's cellular telephone.[6]  *Id.* at 15-25; *see also* N.T., 8/12/24, at 5.

_____

[6] In his motion *in limine*, Appellant did not challenge the admission of photographs depicting the text message thread between Appellant and the deceased (or between Appellant and the deceased's cellular telephone after his death), which were admitted as Commonwealth Exhibits 30 and 31.  N.T., 8/12/24, at 4-5.  Rather, as discussed in greater detail *infra*, Appellant's motion *in limine* concerned whether, or not, text messages sent to individuals other than the deceased were properly authenticated.  *Id.*  Photographs of the text message threads exchanged with third parties (not the deceased) concerning the buying and selling of narcotics were admitted, at trial, as Commonwealth Exhibits 34, 35, and 36.

Appellant properly preserved a challenge to the admission of the third-party text message threads in his motion *in limine*, his Rule 1925(b) concise statement, his statement of questions raised, and his appellate brief, although neither Appellant or the Commonwealth, in their respective appellate briefs, nor the trial court, in its Rule 1925(a) opinion, clearly distinguished between the types of text message exchanges (third-party text message exchanges verses text message exchanges with the deceased) that are at issue in these appeals.  *See* Appellant's Brief at 15-22; *see also* Commonwealth's Brief at 9-16; Trial Court Opinion, 1/10/25, at 7.  As such, we will review Appellant's

It is well-settled that in reviewing a denial of a motion *in limine*,

we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

***Commonwealth v. Mangel***, 181 A.3d 1154, 1158 (Pa. Super. 2018),

*quoting **Commonwealth v. Moser***, 999 A.2d 602, 605 (Pa. Super. 2010),

*appeal denied*, 20 A.3d 485 (Pa. 2011). "[W]hen a party adverse to a trial

court's evidentiary ruling seeks appellate review of that determination, that

party carries a heavy burden to demonstrate that the trial court abused its

discretion." ***Commonwealth v. DiStefano***, 265 A.3d 290, 297 (Pa. 2021).

_____

preserved challenge only to the extent that it relates to admission of the third-party text message exchanges (Commonwealth Exhibits 34, 35, and 26).

Moreover, the text message exchanges between the deceased (or his cellular telephone after his death) and Appellant (***see*** Commonwealth Exhibits 30 and 31) were properly authenticated. In Case 1457 (drug delivery resulting in death, possession with the intent to deliver a controlled substance, and criminal use of a communication facility), the deceased used his cellular telephone to arrange for a January 20, 2021 drug delivery from "Dee" that resulted in the deceased's death. "Dee's" identity was subsequently confirmed in a buy-bust operation, as discussed *infra*. In Case 1467 (possession with the intent to deliver a controlled substance, criminal use of a communication facility, and possession of drug paraphernalia), the buy-bust text message exchange that occurred between the deceased's cellular telephone and the cellular telephone that was discarded by Appellant when he fled from the police authenticated the text message exchanges with the deceased and his cellular telephone in both cases. ***See*** Pa.R.E. 901(b)(11)(B)(ii). So, there was no authentication problem in either case for the text messages Appellant exchanged with the deceased or his device (after his death).

"Pursuant to Pennsylvania Rule of Evidence 901, authentication is required prior to admission of evidence." *Commonwealth v. Talley*, 236 A.3d 42, 59 (Pa. Super. 2020), *aff'd*, 265 A.3d 485 (Pa. 2021); *see also* Pa.R.E. 901. "[T]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "[A]uthentication generally entails a relatively low burden of proof." *Commonwealth v. Bowens*, 265 A.3d 730, 759 (Pa. Super. 2021) (*en banc*) (citation and original brackets omitted), *appeal denied*, 279 A.3d 508 (Pa. 2022). Additionally, "the admissibility of an electronic communication[, such as a text message,] is to be evaluated on a case-by-case basis, as any other document, to determine whether there has been an adequate foundational showing of its relevance and authenticity." *Commonwealth v. Danzey*, 210 A.3d 333, 337 (Pa. Super. 2019), *appeal denied*, 219 A.3d 597 (Pa. 2019).

To authenticate digital evidence, such as text messages, electronic mail, or social medial postings, the proponent of the digital evidence must show that the individual or entity is connected to the digital evidence through

> (A) direct evidence such as testimony of a person with personal knowledge; or
>
> (B) circumstantial evidence such as:
>
> > (i) identifying content; or
> >
> > (ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(b)(11). The official comments to Rule 901 state that "[t]he proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author." Pa.R.E. 901 at *Comments*. As this Court recently explained, "the authentication of text messages turns upon the depth of direct and circumstantial evidence of authorship marshaled by the proponent of the text messages." ***Bowens***, 265 A.3d at 761, *relying on* ***Commonwealth v. Orr***, 255 A.3d 589, 601 (Pa. Super. 2021), *appeal denied*, 266 A.3d 2 (Pa. 2021).

Prior to the start of trial, Appellant, in response to the Commonwealth's motion to admit "essentially messages and communications on [Appellant's cellular telephone]," asserted that "[t]he real issue is the text messages that were located on [Appellant's cellular telephone] that are not text messages sent to the [deceased] in this case. [They were] sent to other individuals."[7] N.T., 8/12/24, at 4-5.[8] In response, the Commonwealth set forth an argument that the text messages sent to individuals, other than the deceased, were relevant, not only to impeach Appellant's prior statements to law enforcement that he was not a drug dealer, but also to establish that, at the time of

---

[7] A written copy of Appellant's motion *in limine* is not part of the certified record presently before us.

[8] We note that, in portions of the notes of testimony, the "Commonwealth" is identified as "The Court." ***See e.g.***, N.T., 8/12/24, at 5, 7. It is apparent from a review of the statements and arguments made by the speaker that those declarations are attributable to the Commonwealth.

Appellant's arrest, he possessed drugs with the intent to distribute them and that the drugs were not in his possession for personal use.[9] *Id.* at 7-8. Conspicuously absent from the Commonwealth's offer of proof was an argument in support of the authenticity of the text messages.[10] *Id.* Moreover, the Commonwealth offered no direct evidence, such as witness testimony, establishing Appellant's connection to the third-party text exchanges and there was no proof of Appellant's possession, access, or control of the cellular device at the time when those text message exchanges were sent to the third-parties. It was at this point that Appellant challenged the authenticity of the text messages by seizing upon the Commonwealth's lack of proof establishing his authorship of the messages.

> [A]lthough the conversations took place on the [cellular telephone] that was located after [Appellant's] arrest, Sergeant Henry testified at the preliminary hearing that it's not uncommon for more than one drug dealer to use the same [cellular telephone] and the same [telephone] number. With regards to that, I think

_____

[9] The Commonwealth asserted that, during an unrecorded interview with police officers after his arrest, Appellant stated "he was not a drug dealer. He only used heroin. He didn't sell it[.]" N.T., 8/12/24, at 7.

[10] The Commonwealth's argument, as set forth in greater detail *infra*, was more akin to an argument to support the admission of the third-party text messages in the context of Pennsylvania Rule of Evidence 404(b), which prohibits the use of propensity evidence. *See Commonwealth v. Yale*, 249 A.3d 1001, 1015 (Pa. 2021) (stating, "Rule 404(b) codifies Pennsylvania's common law prohibition on the use of propensity evidence. It also provides, as at common law, that in a criminal case bad acts evidence may be admissible, under special circumstances, to prove[, *inter alia*, intent,] absence of mistake, or lack of accident but only if the probative value of the evidence outweighs its potential for unfair prejudice.").

there's an actual authenticity issue with regards to whether or not it was [Appellant] who sent those particular messages and [had] those particular conversations [with the third parties].

. . .

So, at this point, with regards to that, there's also no - the terminology that's used, which is the, can I get two, or, can I get three, and the response of an okay or an affirmative response, that's not something that is specific to this particular case. That's how any drug dealer would specifically note the buying and the selling of drugs. So, there is nothing in the messaging specifically that the substance of which would tie it to [Appellant] either.

*Id.* at 9. Thereafter, the trial court ruled that "the evidence is probative" and that it could be admitted at trial. *Id.* at 10.

In support of its evidentiary ruling, the trial court expressed that

the Commonwealth presented evidence that the victim communicated with a person named Dee regarding the purchase of narcotics. Shortly after that communication, including confirmation that that person will come to the [deceased's residence, Appellant] arrived at the [deceased's] home. When the police used the [deceased's cellular telephone to send text messages to] Dee to set up a controlled buy, the person agreed to come to the [deceased's] home. The person who showed up to the [deceased's] home was [Appellant. Appellant] then ran and tossed the [cellular telephone] containing the text messages along his flight path. The text messages were properly authenticated.

Trial Court Opinion, 1/10/25, at 7.

Upon review, while the Commonwealth properly authenticated Appellant's text exchanges with the deceased and, later, his cellular device, we find that the trial court erred in denying Appellant's motion *in limine* as it pertained to the admission of text messages sent to individuals other than the deceased. To authenticate those text messages, the Commonwealth needed

to establish a basis from which the fact-finder could infer, through either direct or circumstantial evidence, that the text messages were authored by Appellant. **See Bowens**, 265 A.3d at 761; **see also** Pa.R.E. 901(b)(11). Prior to the start of trial, when Appellant presented his motion *in limine*, the Commonwealth failed to present proof of the authenticity of those text messages through evidence that would support a finding that Appellant authored the challenged communications, including direct evidence or testimony of a witness with personal knowledge or Appellant's possession, control, or access to the device at the relevant time period. N.T., 8/12/24, at 5-8; **see also** Pa.R.E. 901(a) and (b)(11). Therefore, we are constrained to find that the trial court erred in denying Appellant's motion *in limine*.

Our inquiry, however, does not end, as we must consider whether, or not, the trial court's error in denying Appellant's motion *in limine* constituted harmless error.[11] It is well-established that "an error can be harmless only if [the Commonwealth establishes and] the appellate court is convinced beyond a reasonable doubt that the error is harmless." **Commonwealth v. Story**, 383 A.2d 155, 162 (Pa. 1978). "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to

_____

[11] We do not raise the harmless error doctrine *sua sponte*. Instead, Appellant, as well as the Commonwealth, raise this doctrine in their appellate briefs. Appellant's Brief at 22-29 (asserting that, "[t]he admission of the text messages [was] not harmless beyond a reasonable doubt as it relates to both dockets"); **see also** Commonwealth's Brief at 16-17 (arguing that, "even if the trial court's evidentiary ruling [was] in error, which it was not, the hypothetical error was harmless").

the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless." *Id.* at 164 (citation and original quotation marks omitted). Stated differently, "harmless error exists if the record demonstrates, *inter alia*, that the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence, or that the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Commonwealth v. Copenhaver***, 316 A.3d 1020, 1025 (Pa. Super. 2024), *appeal denied*, 330 A.3d 1248 (Pa. 2024).

As part of its offer of proof, the Commonwealth argued that the text messages were

> relevant to show that [Appellant's] intent when he was apprehended with narcotics was [] to distribute [the drugs and] not to use [the drugs] himself. It also demonstrates that he was not present at the [deceased's] house with narcotics that an undercover [police] officer ordered [while] pretending to be the [deceased] by accident [but], in essence, he was there for a reason. [I]t also is demonstrative to the jury that [Appellant] - or to their inquiry that [Appellant] did possess drugs with intent to deliver and that he was indeed a narcotics trafficker.

N.T., 8/12/24, at 8. Thus, the Commonwealth argued that the unauthenticated third-party text messages were being offered to demonstrate that Appellant harbored a criminal intent to deliver or distribute the controlled substances in his possession. ***See*** 35 P.S. § 780-113(a)(30).

To sustain a conviction of possession with the intent to deliver a controlled substance, "the Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance." *Commonwealth v. Roberts*, 133 A.3d 759, 767 (Pa. Super. 2016) (citation, brackets, and original quotation marks omitted), *appeal denied*, 145 A.3d 725 (Pa. 2016). "The intent to deliver may be inferred from possession of a large quantity of controlled substances." *Roberts*, 133 A.3d at 768 (stating that, "[i]t follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver"). "Other factors to consider when determining whether a defendant intended to deliver a controlled substance include the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and the sums of cash found in possession of the defendant." *Id.* (citation, ellipsis, and brackets omitted).

At trial, Sergeant Henry testified that, at the time of the incident, he was the supervisor of the vice unit, which was tasked with, *inter alia*, investigating drug-related crimes and drug traffickers. N.T., 8/12/24, at 81-82. Sergeant Henry stated that the vice unit conducts "hundreds, if not thousands[,]" of drug investigations per year. *Id.* at 82. Sergeant Henry explained that, typically, fentanyl is packaged in small wax or glassine bags and sold in "a bundle" comprised of 10 bags. *Id*. at 84-85. A "bundle" sells for between $20.00 and $60.00 per bundle. *Id.* As part of his criminal investigation, Sergeant Henry reviewed the deceased's cellular telephone,

- 14 -

which revealed a single text message thread in which the deceased arranged to obtain narcotics from a person identified as "Dee." *Id.* at 108, 110-115. Immediately prior to the deceased's time of death, there were no additional text message threads discovered on the deceased's cellular telephone that related to narcotics purchases from any individual other than "Dee." *Id.* at 108. Utilizing the text message thread between the deceased and "Dee," Sergeant Henry arranged a "buy-bust" operation with "Dee" for two bundles of fentanyl to be delivered to the deceased's house.[12] *Id.* at 120-123. Shortly after setting up the buy-bust transaction, Appellant arrived at the deceased's house and was observed placing several telephone calls to the deceased's cellular telephone that was now in the possession of Sergeant Henry. *Id.* at 123. When a police officer approached Appellant, a chase ensued and Appellant was ultimately taken into police custody. *Id.* at 126-127. At the time he was taken into police custody, Appellant was in possession of, *inter alia*, $120.00 in United States currency, comprised of six $20.00 bills, as well as four glassine bags of what was later confirmed to be fentanyl and etizolam. *Id.* at 127. Sergeant Henry stated that a search of Appellant's person did not produce any drug paraphernalia that would indicate personal drug use. *Id.* at 129. Sergeant Henry further testified that the deceased's contact

_____

[12] Sergeant Henry explained that a "buy-bust operation" occurs when law enforcement arranges to buy narcotics from a dealer and, when the dealer arrives with the narcotics, he or she is arrested or "busted." N.T., 8/12/24, at 121.

information was saved in Appellant's cellular telephone contacts list as "5:45."

*Id.* at 136.

In proving Appellant's intent to deliver or distribute narcotics for purposes of establishing his guilt, we conclude that the trial court's error in admitting Commonwealth Exhibits 34, 35, and 36 was harmless. The Commonwealth established through Sergeant Henry's testimony and Commonwealth Exhibits 30 and 31 that Appellant sold narcotics to the deceased and, in fact, arrived at the deceased's house with the intent to sell narcotics in his possession. This evidence, alone, was more than sufficient to support Appellant's convictions of possession with the intent to deliver a controlled substance. ***Roberts***, 133 A.2d at 767; ***see also*** 35 P.S. § 780-113(a)(32). The record establishes beyond a reasonable doubt that the erroneous admission of Commonwealth Exhibits 34, 35, and 36 was harmless. ***Copenhaver***, 316 A.3d at 1025. Therefore, Appellant is entitled to no relief on his first issue.[13] ***See Commonwealth v. Hairston***, 84 A.3d 657, 672 (Pa.

_____

[13] Moreover, prior to the Commonwealth's introduction of Exhibits 34, 35, and 36, the trial court provided the jury with a cautionary instruction as follows:

> You've heard evidence tending to prove that [Appellant] sold heroin [or] fentanyl to [the deceased] prior to January [20], 2021, and that he was selling heroin [or] fentanyl to other unknown individuals during the same timeframe. I'm referring to the communication and call logs within [Appellant's and the deceased's cellular telephones.] These are acts for which [Appellant is] not on trial. This evidence is before you for a limited purpose, that is for the purpose of tending to show the development of the case.

- 16 -

2014) (stating, improperly admitted evidence may be harmless error); **see also Commonwealth v. Roman-Rosa**, 311 A.3d 564, 2023 WL 8451800, at *10 (Pa. Super. filed Dec. 6, 2023) (unpublished memorandum) (holding that, evidence improperly admitted in violation of Rule 404(b) may constitute harmless error), *appeal denied*, 328 A.3d 996 (Pa. 2024).

In his second issue, Appellant challenges the sufficiency of the evidence to support his conviction of drug delivery resulting in death. Appellant's Brief at 6, 25-29. Our standard and scope of review of a challenge to the sufficiency of the evidence to support a conviction are well-settled.

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be

---

> [Appellant's] identity as a perpetrator, his intent in possessing narcotics to rebut his statements to police[, or] to demonstrate his presence at the scene was not accidental or coincidental.
>
> This evidence should not be considered by you in any other way other than for the purpose I just stated. You must not regard this evidence to show that [Appellant] is a person of bad character or criminal tendencies for which you might be inclined to defer to today.

N.T., 8/12/24, at 137. It is well-settled that "[j]uries are presumed to follow a [trial] court's instructions." **Commonwealth v. Naranjo**, 53 A.3d 66, 71 (Pa. Super. 2012).

resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [fact-finder,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Reed*, 216 A.3d 1114, 1119 (Pa. Super. 2019).

Section 2506 of the Crimes Code defines the criminal offense of drug delivery resulting in death as follows:

A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [Section 780-113(a)(14) or (30) of] The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a); *see also* 35 P.S. § 780-113(a)(14) and (30).[14] Thus, to sustain a conviction of drug delivery resulting in death, the Commonwealth

---

[14] Section 780-113(a)(14) prohibits the "administration, dispensing, delivery, gift[,] or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision" except when done in good faith, within the scope of the patient relationship, and in accordance with accepted medical treatment principles. 35 P.S. § 780-113(a)(14).

Pertinent to the case *sub judice*, Section 780-113(a)(30) prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under [The Controlled Substance, Drug, Device and Cosmetic Act], or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering

must establish that the defendant intentionally administered, dispensed, delivered, gave, prescribed, sold, or distributed a controlled substance in violation of either Section 780-113(a)(14) or Section 780-113(a)(30) of The Controlled Substance, Drug, Device and Cosmetic Act and another person died as a result of the controlled substance. *Commonwealth v. Peck*, 242 A.3d 1274, 1280-1281 (Pa. 2020); *see also Commonwealth v. Scott*, 325 A.3d 844, 850 (Pa. Super. 2024).

"[T]he Commonwealth need not prove that the defendant intended to cause the death of another. Instead, the Commonwealth must establish that the defendant's act of administering, dispensing, delivering, giving, prescribing, selling, or distributing the [controlled] substance was intentional and that the defendant had a reckless disregard of death from the use of the contraband." *Scott*, 325 A.3d at 850 (citations and quotation marks omitted); *see also Commonwealth v. Carr*, 227 A.3d 11, 16-17 (Pa. Super. 2020) (stating, "the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband"). "Given the inherent danger[s] of consuming fentanyl in an unknown strength and the high possibility that death could occur, the Commonwealth satisfies the reckless element as to the possibility of death when the substance involved is

---

or possessing with intent to deliver, a counterfeit controlled substance." 35 P.S. § 780-113(a)(30).

fentanyl." ***Scott***, 325 A.3d at 850, *citing* ***Commonwealth v. Storey***, 167 A.3d 750, 758 (Pa. Super. 2017), *appeal denied*, 217 A.3d 1213 (Pa. 2019).

Pennsylvania law is well-settled that Section 2506(a) adopts a "but-for" causation requirement. ***Commonwealth v. Kakhankham***, 132 A.3d 986, 993 (Pa. Super. 2015) (stating that, Section 2506(a) "requires a 'but-for' test of causation"), *appeal denied*, 138 A.3d 4 (Pa. 2016). Thus, the Commonwealth must establish that "but-for" a defendant administering, dispensing, delivering, giving, prescribing, selling, or distributing the controlled substance, the victim would not have died. ***Kakhankham***, 132 A.3d at 995. Section 303(a)(1) of the Crimes Code states that "[c]onduct is the cause of a result when[] it is an antecedent but for which the result in question would not have occurred[.]" 18 Pa.C.S.A. § 303(a)(1). "Additionally, criminal causation requires the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible.'' ***Kakhankham***, 132 A.3d at 993 (citation and original quotation marks omitted). A defendant's conduct, however, "need not be the only cause of the victim's death in order to establish a causal connection. Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." ***Id.*** at 993 n.8 (citation omitted); ***see also Commonwealth v. Proctor***, 156 A.3d 261, 271 (Pa. Super. 2017), *appeal denied*, 172 A.3d 592 (Pa. 2017).

Here, Appellant concedes that the deceased's death was caused by the use of fentanyl. Appellant's Brief at 26 (stating, "the second element is not in dispute"). Appellant contends, however, that "the Commonwealth failed to establish that [Appellant] was the one who sold fentanyl to the [deceased] and that the sale was a cause of death." *Id.* Appellant argues that "the Commonwealth's evidence was speculative that [Appellant] was the seller of the drugs that killed the [deceased]." *Id.* at 28.

In finding there was sufficient evidence to support Appellant's conviction, the trial court explained

> the Commonwealth presented evidence that showed that [Appellant] exchanged text conversations with the [deceased] regarding the sale of narcotics, specifically fentanyl. The [deceased] was saved as a contact on [Appellant's cellular telephone]. After reviewing the text messages on the [deceased's cellular telephone], the police observed that the [deceased] made several narcotics purchases from [Appellant] including the purchase that resulted in his death. The Commonwealth presented video evidence showing [Appellant] arriving at the [deceased's] home after [the deceased arranged] a narcotics purchase *via* text message on January 20, 2021. On January 21, 2021, the [deceased] was found [dead] with the cause of death determined to be a fentanyl overdose.

Trial Court Opinion, 1/10/25, at 6 (record citations omitted).

On January 21, 2021, law enforcement discovered the deceased in his residence shortly after 9:00 a.m. N.T., 8/12/24, at 24-25. The Dauphin County deputy coroner testified that the deceased had been dead for "approximately 8 to 10 hours," which puts the deceased's time of death at between 11:00 p.m. on January 20, 2021, and 1:00 a.m. on January 21,

2021. *Id.* at 35. The parties stipulated that a forensic toxicology test revealed that a sample of the deceased's blood contained, *inter alia*, 9.2 nanograms per milliliter of fentanyl, 3.4 nanograms per milliliter of norfentanyl, and 61 nanograms per milliliter of etizolam. *Id.* at 39. Dr. Ross opined to a reasonable degree of scientific certainty that the deceased died as a result of acute fentanyl toxicity, as well as etizolam toxicity. *Id.* at 76.

Sergeant Henry testified that a review of the deceased's cellular telephone revealed a single text message thread related to the trafficking of narcotics by a person identified as "Dee." *Id.* at 108. The deceased's cellular telephone did not contain any other text message threads with third-parties related to the purchasing of narcotics. *Id.* When Sergeant Henry arranged a "buy-bust" transaction with "Dee" after the deceased's death, Appellant arrived at the deceased's house with fentanyl found on his person in quantities indicative of drug trafficking. *Id.* at 128-129.

Prior to his death, the deceased communicated with "Dee" *via* text messaging to arrange the purchase, and delivery, of fentanyl to his residence. *Id.* at 114. A review of the deceased's cellular telephone text messages reveals that, on January 20, 2021, at 9:50 a.m., the deceased requested that "Dee" deliver two bundles of fentanyl. Commonwealth Exhibit 30 (stating, "can [I] get 2 like yesterday?"). At 9:55 a.m., "Dee" replied, "Stop havein ppl txt me [I] told u that." *Id.* At 10:05 a.m., the deceased replied, "my friend yesterday and me" to which "Dee" replied, at 10:07 a.m., "Stop haven other ppl txt n me  I wil no meet u again if [I] tel u that again." *Id.* Thereafter, at

12:10 p.m., video surveillance footage showed an unidentified individual enter the deceased's residence and depart shortly thereafter.[15] N.T., 8/12/24, at 95-96. The individual was described as wearing, *inter alia*, a black jacket with a gray or light-colored hoodie underneath the jacket. **Id.** at 97. When Appellant was taken into police custody as a result of the "buy-bust" operation, he was wearing a black jacket with a light-colored hoodie underneath the jacket. **Id.** at 129.

Upon review, we concur with the trial court that there was sufficient evidence to support Appellant's conviction of drug delivery resulting in death. The deceased's cellular telephone showed a single text message thread related to drug trafficking that discussed the deceased's purchasing of fentanyl from an individual identified as "Dee." A series of text messages on January 20, 2021, revealed that the deceased arranged to purchase fentanyl from "Dee." No other text message threads arranging the purchase of drugs at or

---

[15] The video surveillance recording reveals a white male (Appellant is an African-American male) enter the deceased's house at around 12:50 p.m. on January 20, 2021. N.T., 8/12/24, at 99. The white male was believed to be deceased's "lifelong friend." **Id.**

A third individual is also observed entering the deceased's residence on January 20, 2021, at around 1:30 p.m. **Id.** at 100. The third individual, who was not identified, was observed arriving at the deceased's residence in a black Kia sedan. **Id.** at 102-103. This third individual returned to the deceased's residence on January 21, 2021, in a black Kia sedan and entered the deceased's residence at 7:57 a.m. carrying what appeared to be a grocery bag. **Id.** at 103-104. Sergeant Henry testified that, on January 21, 2021, Appellant arrived at the deceased's residence for purpose of the "buy-bust" transaction driving a black Acura sedan. **Id.** at 123.

around this time period were recovered from the deceased's cellular telephone. Shortly thereafter, an individual entered the deceased's residence wearing a light-colored hoodie underneath a black jacket. Two other individuals were subsequently observed entering the deceased's residence. The first individual was identified as a white male. The second individual, who entered the deceased's residence twice, arrived in a black Kia sedan and was observed on one occasion carrying a grocery bag.[16] On January 21, 2021, when law enforcement arranged a buy-bust transaction with "Dee" using the deceased's cellular telephone, Appellant arrived at the deceased's residence in a black Acura sedan with packaged fentanyl ready for distribution. Appellant was apprehended wearing a light-colored hoodie underneath a black jacket. In viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, there was sufficient evidence to link Appellant's distribution of fentanyl to the deceased's death from acute fentanyl toxicity. *See Kakhankham*, *supra*.

_____

[16] When the individual carrying the grocery bag was observed entering the deceased's residence, the victim, according to Dr. Ross, was already deceased.

Judgments of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/25/2025